# UNITED STATES DISTRICT COURT
## for the
## Eastern District of California

FILED
JUN 24 2010
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
         DEPUTY CLERK

| United States of America | ) | Case No: |
|---|---|---|
| v. | ) | 1:10-mj-149-GSA |
| | ) | |
| Fernando AVILA, | ) | |
| Rafael Mendez ESPARZA | ) | |
| JOSELO, | ) | |
| JOAQUIN, and | ) | SEALED |
| Uriel Contreras CORTES, aka URIEL | ) | |
| | ). | |
| *(Defendant)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Between May 17, 2010 and June 23, 2010, in the County of <u>Stanislaus</u>, in the Eastern District of California, the defendants violated Title <u>21</u> of the United States Code, Sections <u>846 and 841(a)(1)</u>, an offense described as follows:

Conspiracy to Distribute and Possess Methamphetamine with Intent to Distribute

This criminal complaint is based on these facts:

**SEE ATTACHED**

☒ Continued on the attached sheet.

_____
*Applicant's Signature*

Mark Putnam, Special Agent DEA
*Printed Name and Title*

Sworn to before me and signed in my presence,

Date: 6/22/10

_____
*Judge's signature*

City and State: Fresno, California

Honorable Gary S. Austin, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF COMPLAINT**

I, Mark Putnam, Special Agent with the Drug Enforcement Administration, Fresno, being duly sworn, do depose and state:

1. I am an "investigative or law enforcement officer" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code and Title 21, United States Code.

2. I have been employed by the United States Drug Enforcement Administration ("DEA") since February 2004, at which time I completed sixteen (16) weeks of DEA Basic Agent training at the Justice Training Center in Quantico, Virginia. I am a Special Agent with the DEA, Fresno Resident Office, Fresno, California; I have been so assigned since August 2004. Prior to my employment with the DEA, I was employed as a Police Officer, and as a Detective with the Albuquerque Police Department (APD), Albuquerque, New Mexico, from April 1996, to February 2004. While employed by APD, I worked as a Patrolman and as a Narcotics Detective. I was assigned to a DEA Task Force from September 2002, until February 2004, at which time I became employed by the DEA. I am currently assigned to the Fresno Methamphetamine Task Force, which is part of the Central Valley California High Intensity Drug Trafficking Area (HIDTA). In connection with my official DEA duties, I investigate criminal violations of federal narcotics' laws, including, but not limited to, Title 21, United States Code, Sections 841, 843, 846 and 848. I have received special training and participated in the enforcement of laws concerning controlled substances as found in Title 21 of the United States Code. I have testified in judicial proceedings and prosecutions for violations of controlled substance laws. I also have been involved in various types of electronic surveillance, and in the debriefing of defendants, witnesses and informants, as well as others who have knowledge of the distribution and transportation of controlled substances, and of the laundering and concealing of proceeds from drug trafficking in violation of Title 18, United States Code, Sections 1956 and 1957.

3. I have received training in and participated in investigations involving the interception of both wire communications and the electronic communications of digital display paging devices. I am familiar with the ways in which drug traffickers conduct their business, including, but not limited to,

1

their methods of importing and distributing controlled substances, their use of telephones and digital display paging devices, and their use of numerical codes and code words to conduct their transactions. I also know from my training and experience that narcotic traffickers put communication devices in the names of associates and/or relatives. The use of false names and identifications is a method to impede law enforcement investigations into the true identity of the subscriber and user of the communication device.

4. I am familiar with and have participated in all of the normal methods of investigation, including, but not limited to, visual surveillance from the ground and air, the general questioning of witnesses, the use of informants, the use of pen registers, the execution of search warrants, and undercover operations.

5. This affidavit is submitted in support of a request that a complaint and arrest warrants be issued for JOSELO LNU, Fernando AVILA, Rafael Mendez ESPARZA, JOAQUIN LNU, and Uriel Contreras CORTES, aka URIEL, charging them with conspiring to distribute and possess with intent to distribute methamphetamine, in violation of Title 21, United States Code, Sections 846 and 841(a)(1).

6. I learned the following from information provided to me by agents of the California Bureau of Narcotic Enforcement.

7. On April 12, 2010, agents with the Fresno Methamphetamine Task Force, commenced court-authorized wire interceptions of two telephones used by ESPARZA (hereinafter Target Telephones 1 and 2). During interceptions of ESPARZA's telephones, agents intercepted communications of JOSELO LNU (who was using Target Telephone 3) and JOAQUIN (who was using Target Telephone 4). Court authorized wire interceptions of Target Telephones 3 and 4 commenced on April 29, 2010 and were discontinued due to inactivity on May 3 and 4, 2010. Thereafter, agents identified three new telephones used by ESPARZA, Target Telephones 5, 6, and 7, and two new telephone used by JOSELO (Target Telephones 8 and 9).

**A. APRIL 30, 2010 - ESPARZA DRUG DELIVERY.**

8. On April 30, 2010, at approximately 1407 hours, ESPARZA used Target Telephone 1 to contact JOSELO who was using Target Telephone 3. The two individuals discussed meeting and

2

ESPARZA indicated that he would be available after his child got out of school in two to two and one-half hours. Based upon my training and experience, and this investigation, ESPARZA was using a coded reference to indicate that the drug shipment would be ready in 2 to 2½ hours. JOSELO said that he wanted a "break" because "it's full." Based upon my training and experience, and my knowledge of this investigation, I believe that JOSELO was telling ESPARZA that he wanted a break in shipments of narcotics because he had not yet sold his supply of drugs. JOSELO said he would talk to "Fernando" (AVILA) to have the shipments stop for a short time. Based upon my training and experience and knowledge of this investigation, I believe that ESPARZA meant that he had directed JOSELO to call "Fernando" (AVILA) to slow the narcotics shipments. The conversation indicated that JOSELO was not expecting a shipment of drugs until Friday and then realized it was indeed Friday.

9. At approximately 1619 hours, ESPARZA used Target Telephone 1 to place a call to Target Telephone 3, used by JOSELO. ESPARZA asked if he was clear to go. Based upon my training and experience and knowledge of this investigation, I believe that ESPARZA was asking JOSELO whether it was a good time for ESPARZA to deliver the narcotics. JOSELO told ESPARZA "yes" and that ESPARZA could come in. ESPARZA said he would arrive in five minutes. An agent accessed precision location data for Target Telephone 1 which indicated that the phone was near 1535 Ohio Avenue, Modesto, California. Based upon my training and experience and knowledge of this investigation, I believe that ESPARZA made a delivery of narcotics to JOSELO at 1535 Ohio Avenue.

**B. MAY 17, 2010 - SEIZURE OF 17.9 POUNDS OF METHAMPHETAMINE.**

10. On May 17, 2010, at 1058 hours, Target Telephone 8 (used by JOSELO) received a call from a telephone used by Fernando AVILA. JOSELO asked AVILA if he called and AVILA told JOSELO yes. AVILA identified himself as "Fernando" to JOSELO. JOSELO acknowledged that he knew it was "Fernando." JOSELO told AVILA he was calling about "Brian" (throughout the interceptions referred to herein, Rafael Esparza MENDEZ has been referred to as "Brian"). Additionally, ESPARZA has referred to himself as "Brian" in introducing himself in several intercepted calls that SA Sanchez has heard. JOSELO told AVILA he wanted ESPARZA to call him. AVILA told JOSELO that it would not be a problem. JOSELO told AVILA that he wanted to meet with ESPARZA. JOSELO told AVILA that there are some "cartas" (a Spanish word meaning

3

letters/mail) that came in the mail this morning. Based on my training and experience and knowledge of this investigation, I believe "cartas" is a code word for methamphetamine. JOSELO said that he wanted to give them to AVILA. AVILA told JOSELO not to worry about it and indicated that he was camping with his family and they could do it whatever way he wanted. JOSELO told AVILA the letters arrived early this morning. AVILA told Joselo he would do it whenever he wanted. JOSELO told AVILA to have "Brian" (ESPARZA) give him a call.

11. At 1213 hours, ESPARZA's telephone received a call from AVILA's telephone. AVILA told ESPARZA that "Chelo" (JOSELO) called and wanted ESPARZA to call him. ESPARZA asked AVILA how he could contact JOSELO because he did not have JOSELO's number.

12. At 1611 hours, JOSELO placed a call to URIEL[1] and asked URIEL if he could see "Brian" (ESPARZA) and that ESPARZA was at the "volleyball courts." Based upon my knowledge of this investigation, I know of two volleyball courts frequented by drug traffickers in the Modesto area. URIEL asked JOSELO what he wanted him to do. JOSELO told URIEL he wanted to give him "un ciego" (the Spanish word for blind) "tuerto" (the Spanish word for a person with one eye). URIEL repeated what JOSELO had said and asked JOSELO if he should get it from the house. Based on my training and experience and knowledge of this investigation, I believe JOSELO told URIEL to deliver a certain amount of methamphetamine. URIEL asked JOSELO if he (JOSELO) wanted him (URIEL) to take it and JOSELO said yes. URIEL asked JOSELO what truck he wanted him to take and JOSELO said it did not matter. URIEL asked JOSELO if he was going to take it to the "volley." JOSELO told ESPARZA he could do it at the volley ball courts or he could have him (ESPARZA) move. URIEL told JOSELO that the "volleyball courts" are good. URIEL told JOSELO that he would have to open everything because that there were some doubles. URIEL told JOSELO he was not going to give him (ESPARZA) doubles. URIEL told JOSELO that he was going to have to count one by one to make sure they are ten and ten to make "ciego." JOSELO told URIEL that the car will have a window open so they can put it in there. Based on my training and experience and knowledge of this investigation, I believe JOSELO told URIEL that ESPARZA would leave a window of his car open so URIEL could

---

[1] URIEL was later identified as Uriel Contreras CORTES after he supplied this name and the telephone number intercepted in use by URIEL to an officer when stopped by law enforcement.

4

get access to the car to put the methamphetamine in the car. URIEL told JOSELO to tell him (ESPARZA) to wait for him. URIEL told JOSELO that it would be about twenty minutes and that he had to go there to count them.

13. At 1612 hours, ESPARZA received a call from AVILA and told AVILA that it was the same from the other day. AVILA asked ESPARZA if he already picked it up and ESPARZA said no, they are going to bring it to him (ESPARZA). AVILA asked ESPARZA to look at one of them. Based upon my training and experience and knowledge of this investigation, I believe that in this context, one of them means drugs. ESPARZA told AVILA that he was just going to look at them. ESPARZA asked AVILA if he was going to take it to his brother in law. AVILA told ESPARZA to look at them/review. ESPARZA told AVILA that he will take them to his sister-in-laws. AVILA told ESPARZA that it's up to him (ESPARZA). ESPARZA told AVILA that he would leave them there until Monday morning and AVILA agreed. AVILA told ESPARZA to take a good look at them and review them. ESPARZA told AVILA okay. Based upon my training and experience and knowledge of this investigation, I believe that AVILA directed ESPARZA to look at the narcotics to make sure that they received what they were supposed to.

14. At 1615 hours, ESPARZA received a call from JOSELO and told him that he wanted to do it at another location because somebody was watching. JOSELO told ESPARZA that no one was going to see anything, that ESPARZA was going to be playing, (vollyball) and JOSELO would call when his uncle was there (SA Sanchez listened to an intercepted call between JOSELO and URIEL in which JOSELO referred to URIEL as "tio," the Spanish word for uncle). JOSELO told ESPARZA they would do it however ESPARZA wanted. ESPARZA told JOSELO that the person who was watching them asked him to start working together. ESPARZA added that he does not have JOSELO's number. JOSELO told ESPARZA they would do it however ESPARZA wanted. ESPARZA changed his mind and said that it was a good place and they would do it there (at the volleyball court). ESPARZA told JOSELO that he would park the car there and leave it unlocked. ESPARZA asked JOSELO to have them put it in the trunk and lock it. JOSELO asked ESPARZA if it was the same place they saw each other earlier (volleyball courts).

///

1      15. Based on my training and experience and knowledge of this investigation, I believe that
2  JOSELO and ESPARZA were discussing a narcotics transaction. I believe that JOSELO and
3  ESPARZA were discussing the arrangements for URIEL to deliver the narcotics, as JOSELO and
4  URIEL had discussed as set forth above. I believe that when ESPARZA told JOSELO to have them
5  put it in the trunk and lock it, ESPARZA was referring to having URIEL put the narcotics in
6  ESPARZA'S trunk.

7      16. On May 17, 2010, at 1142 hours, ESPARZA placed a call to AVILA. AVILA asked
8  ESPARZA what he was doing and ESPARZA told AVILA he was on the streets. AVILA told
9  ESPARZA to bring "la gente" (a Spanish word for people) that she has over here (to AVILA) and
10  ESPARZA asked what. AVILA told ESPARZA to bring over the "lo moro" (the Spanish word for
11  guy) that were going to go to work, "the ones you have there." Based on my training and experience
12  and knowledge of this investigation, I believe that when AVILA asked ESPARZA to bring AVILA "la
13  gente" and "lo moro," AVILA was referring to the narcotics ESPARZA received from URIEL as
14  arranged through JOSELO. ESPARZA asked AVILA where and AVILA told ESPARZA "to me" so
15  they could go with "compadre." ESPARZA asked AVILA to which "compadre" and AVILA said
16  "Franky." ESPARZA asked AVILA if he was talking about the "caro" (car) or the other one. AVILA
17  told ESPARZA the first one he arranged. ESPARZA asked why he needed to stop there (AVILA's
18  house). AVILA told ESPARZA he wanted him to stop there because he (AVILA) wanted to see him to
19  talk to him. ESPARZA told AVILA that he wanted to talk to him as well. AVILA said that is why
20  ESPARZA should stop there, so they could talk. AVILA added that ESPARZA would only be there
21  for about two (2) or three (3) minutes. ESPARZA told AVILA that he saw a suspicious truck in the
22  morning and that was the reason he did not want to stop.

23      17. At 1149 hours, ESPARZA received a call from AVILA who asked when he saw it (truck).
24  ESPARZA told AVILA he saw it when he was leaving the house. ESPARZA told AVILA that he saw
25  it at the lights at Keyes. AVILA told ESPARZA not to worry about it and to go over. ESPARZA told
26  AVILA he was going to go the back roads and AVILA told ESPARZA to go over there (AVILA's
27  house).
28  ///

1　　　18. At 1250 hours, Officer Royal from the California Highway Patrol (CHP), in a marked unit,
2　conducted a vehicle stop on the Nissan bearing California license plate number 6JOM393 (RO:
3　Frederick Morillo, PO Box 323, Empire, California) for Vehicle Code (VC) code violation 5201 (f)-
4　obstruction of rear license plate. Officer Royal identified the driver as Rafael Mendez ESPARZA.
5　Officer Royal asked ESPARZA where he was going and ESPARZA told Officer Royal to the house on
6　the corner. ESPARZA then pointed in the direction of 9238 Hillside Drive (Fernando AVILA's house).
7　As a result of the vehicle stop, Officer Royal seized 10 brick shaped packages containing a total of
8　8,136.9 grams (17.9 pounds) of methamphetamine. An agent conducted a presumptive test on the
9　methamphetamine and the results were positive.

10　　　**C. LOCATIONS USED BY JOSELO TO STORE METHAMPHETAMINE.**

11　　　19. On June 8, 2010, JOSELO received an incoming call AVILA. JOSELO told AVILA that
12　he knew they agreed to do it tomorrow, but he did not want to look bad, so he sent his uncle (URIEL).
13　AVILA asked if he already sent URIEL and JOSELO told AVILA that URIEL was already thirty
14　minutes ahead. AVILA told JOSELO to tell URIEL to go to the same place where the horse stalls are
15　at. JOSELO told AVILA he was interested in renting out there, because he had four horses. AVILA
16　told JOSELO he would rent it out to him and added that tomorrow they were going to install a trailer.
17　AVILA told JOSELO described the trailer as a three (3) bedroom and two bath. JOSELO told AVILA
18　he would have his aunt and uncle stay there to take care of the animals. JOSELO said he might go
19　tomorrow and AVILA said he would be there by 0700 am (June 9, 2010). AVILA asked JOSELO
20　what number he sent. JOSELO told AVILA he could only get one with two zeros (100). JOSELO said
21　that was all he could give him because some guy did not pay. Based on my training and experience, I
22　believe JOSELO was sending URIEL to make a payment of $100,000 for narcotics previously
23　received. I further believe the payment is being made to Fernando AVILA.

24　　　20. On June 9, 2010, at 1612 hours, JOSELO received a call from JOAQUIN. JOAQUIN told
25　JOSELO that there was "ciento 8" (108 in Spanish). JOSELO told JOAQUIN to put in 107. JOSELO
26　told JOAQUIN to put the little truck in the garage. Based upon my training experience, I believe that
27　JOAQUIN was reporting on the amount of drugs available and JOSELO was instructing JOAQUIN as
28　to how many to store and further instructed JOAQUIN to put the vehicle which had stored the drugs

7

1  inside the garage. At this time, precision location data for JOAQUIN's telephone showed it to be
2  located at 2900 McCord Way, Ceres, California. At 1625 hours, an officer drove by this location and
3  saw a vehicle at the residence that agents have previously seen JOAQUIN driving. At 1701 hours,
4  JOAQUIN called JOSELO and told him that he was done. Based on my training and experience and
5  knowledge of this investigation, I believe JOAQUIN meant he was done putting the narcotics in the
6  garage. At that time, JOAQUIN's telephone was still located at the McCord residence.

7  21. On June 9, 2010, JOSELO received a call from an unidentified male (UM). JOSELO told
8  the man that he wanted to leave at 0300 so he could be there by 0900. The man told JOSELO that he
9  could bring "them up." JOSELO agreed and JOSELO said he wanted to talk to UM in person. UM
10 told JOSELO that he would be leaving early tomorrow (June 10, 2010).

11 22. At 1454 hours, JOSELO received a call from telephone number the UM who asked if
12 JOSELO could deposit some money for his expenses and JOSELO agreed. JOSELO told UM he
13 would call him back to get the information. At 1549 hours, SA Sanchez used the precision location
14 data on the telephone used by UM and found it located in Los Angeles, California. Later, at 2131
15 hours, JOSELO received a call from the UM. The UM asked JOSELO where he was located and
16 JOSELO said Modesto. UM told JOSELO he would leave early in the morning and asked if he
17 needed to go on 5 (Interstate 5). JOSELO told UM that the 5 would turn into Highway 99 around
18 Bakersfield. JOSELO told UM that he would be waiting for him.

19 23. On June 6, 2010, at 0818 hours, JOSELO received a call from the UM who told JOSELO
20 that he was 18 away and JOSELO told him to take the Carpenter exit. JOSELO told UM to take a left
21 on Carpenter. At 0847 hours, SA Sanchez utilized precision location data on the UM's telephone to
22 determine that he was located at a gas station at 818 N. Carpenter, Modesto, California. At 0849 hours,
23 an agent saw a grey Toyota Avalon parked at the Quick Stop located at 818 N. Carpenter Road,
24 Modesto, California. Agents also observed an older Hispanic male adult (HMA), wearing a blue shirt,
25 standing next to the vehicle. At 0855 hours, Agent Sanchez once again used precision location data on
26 the UM's telephone which was still located at a gas station at 818 N. Carpenter Road, Modesto.

27 24. At 0917 hours, an agent saw the HMA get into the vehicle and drive away from the area.
28 Agents followed the vehicle away from the area. Agents temporary lost visual of the car in the area of

8

Waverly and Carpenter. At 0927 hours, an agent established surveillance at 1535 Ohio Avenue, Modesto, California and observed the aforementioned grey Toyota Avalon parked to the rear of the property of 1535 Ohio Avenue. The agent observed a brown Honda van and observed two people in the van. An agent observed the passenger of the vehicle and described him as a HMA wearing a blue shirt. At 1001 hours, an agent used precision location data on JOSELO's telephone and determined that it was located at 1535 Ohio Avenue, Modesto, California.

25. At 1011 hours, an agent saw a black BMW, previously driven by JOSELO was seen leaving 1535 Ohio Avenue, Modesto, California. At 1330 hours, agents terminated surveillance of 1535 Ohio Avenue, Modesto, California. Agents continued to use the precision location data on the UM's telephone and determined that the telephone was moving southbound on Highway 99. Based on the intercepted conversations and SA Sanchez' knowledge of this investigation, agents believe that the UM made a drug-related delivery to JOSELO at 1535 Ohio Avenue, Modesto, California.

26. On June 10, 2010, agents monitored several conversations between JOSELO and JOAQUIN involving discussions of drugs. At 1309 hours, JOSELO received a call from JOAQUIN who told him that he "had two but nothing to measure them." JOAQUIN told JOSELO that Maciel took it (possibly referring to a scale). JOSELO told JOAQUIN to come over when he is done. At 1327 hours, JOSELO received a call from telephone number another man identified only as ROMAN. ROMAN told JOSELO he wanted "two of those from Mexico" and asked if he could have them for "19" each. Based upon my training and experience, I believe that ROMAN was referring to purchasing methamphetamine for $19,000. JOSELO told ROMAN that he gets them for "18" and he would make $500 and agreed to sell them to ROMAN. Based on my training and experience and knowledge of this investigation, I believe JOSELO is going sell ROMAN two (2) kilos of methamphetamine. I also know from talking to informants that the current price per kilo of methamphetamine varies between $18,000 to $20,000 regarding this organization.

27. At 1409 hours, JOSELO received a call from another unidentified male. JOSELO asked the male if they "saw them" and if they "liked them." The male said he talked to "the guy" and he did not like them. JOSELO told the male that they arrived like "campeones" (the Spanish word for champions). Based on my training and experience, I believe the male was showing methamphetamine

1 obtained from JOSELO to a potential customer who was not satisfied with the quality of the
2 methamphetamine.

3     28. At 1618 hours, JOSELO received a call from telephone ~~number~~ ROMAN. [handwritten: Call From MEP] ROMAN told
4 JOSELO that he was ready to get them. JOSELO told ROMAN to meet him where he was. At 1647
5 hours, JOSELO called ROMAN and told him to get there and ROMAN said he was on his way. At
6 1929 hours, JOSELO placed a call to JOAQUIN and told him to go to the house and pick up two
7 "muebles" (the Spanish word for couches). JOSELO told JOAQUIN to take "Balde" with him and to
8 get two that cost fifty each. At 1936 hours, JOSELO received a call from JOAQUIN who said that he
9 was at the house with "Balde." JOSELO told JOAQUIN to get the two of the "450" normal ones.
10 JOSELO told JOAQUIN to separate them. JOSELO added that they weighed 810. JOSELO told
11 JOAQUIN to call him back. Based on my training and experience, I believe when JOSELO said 450
12 he was referring to 450 grams of methamphetamine, approximately one pound of methamphetamine
13 (one pound is the equivalent of 454 grams).

14     29. At 1942 hours, JOSELO received a call from ROMAN who asked JOSELO if they were
15 measured correctly. ROMAN then asked JOSELO if he was there when they measured it. ROMAN
16 said they are supposed to be 4 and 1/2. ROMAN added he has "one" that is opened and "one" that is
17 unopened. JOSELO told ROMAN to weigh them completely. Based upon my training and
18 experience, I believe that ROMAN was complaining that the weight of the drugs was less than had
19 been agreed upon.

20     30. At 1944 hours, JOSELO placed a call to JOAQUIN. JOSELO asked JOAQUIN if he
21 measured them and JOAQUIN said URIEL measured them. JOSELO told JOAQUIN that ROMAN
22 called and they were not measured correctly. JOSELO told JOAQUIN to weigh them. Based upon my
23 training and experience, I believe that JOSELO was telling JOAQUIN to weigh the package of
24 methamphetamine again.

25     31. JOSELO then received a call from ROMAN. ROMAN told JOSELO that they weighed
26 672. JOSELO repeated "672" and JOSELO told ROMAN that is not a lot. ROMAN said he thinks
27 URIEL made a mistake. JOSELO told ROMAN that he was going to call URIEL and then call
28 ROMAN back.

32. At 1946 hours, JOSELO called JOAQUIN and asked if he saw URIEL measure them out. JOSELO added that ROMAN weighed them and they were short. JOAQUIN said that they weighed "mil diez" (the Spanish words for 1,010). JOSELO told JOAQUIN not to let URIEL touch them and for JOAQUIN to do it all. JOSELO told JOAQUIN to weigh them again. Between 1947 hour and 1949 hours, JOSELO placed five calls to URIEL's number.

33. At 1949 hours, JOSELO placed a call to ROMAN. JOSELO asked ROMAN how much they were short and ROMAN said he was weighing them one by one. JOSELO told ROMAN that "Cocine" (a reference to JOAQUIN) and URIEL weighed them at 1010 each. JOSELO asked ROMAN to weigh them again. Between 1950 and 1952 hours, JOSELO placed two additional calls to URIEL. At 1953 hours, JOSELO placed a call to JOAQUIN and asked if he was still at the house and JOAQUIN replied that he was at his house. JOSELO told JOAQUIN to tell "Balde" to take that stuff and for JOAQUIN to stay there. JOSELO told JOAQUIN to take everything out and that he would be stopping by.

34. At 1954 hours, JOSELO received a call from ROMAN. ROMAN told JOSELO that the guys were wrong. ROMAN told JOSELO that one is from where they come from (Mexico) and the other one is from here (United States). ROMAN told JOSELO that he was the one that got them and no one touched them. JOSELO told ROMAN that it was ok and told him it was ok if he wanted to come for the other ones. ROMAN asked if they could do it tomorrow. ROMAN added that tomorrow he would bring the guy to get the rest. JOSELO added he was upset with URIEL. At 2015 hours, I utilized precision location data on JOSELO's telephone and the phone was located at 2900 McCord Way, Ceres, California. At 2031 hours, and agent drove by 2900 McCord Way, Ceres, California and saw the black BMW driven by JOSELO parked at the residence.

35. Based the totality of the intercepted conversations and surveillance, I believe JOSELO, with the assistance of JOAQUIN and URIEL, distributed methamphetamine to ROMAN. Furthermore, I believe 2900 McCord Way, Ceres, California is the location where they are keeping the methamphetamine.

///

///

## **CONCLUSION**

36. Based upon this information, there is probable cause to believe that JOSELO LNU, Fernando AVILA, Rafael Mendez ESPARZA, JOAQUIN LNU, and Uriel Contreras CORTES, aka URIEL, conspired to distribute and possess with intent to distribute methamphetamine, in violation of Title 21, United States Code, Sections 846 and 841(a)(1).

Mark Putnam, Special Agent, DEA

Sworn and Subscribed before me on ~~May~~ 6/22, 2010

Honorable Gary S. Austin
United States District Judge

12